# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**THOMAS E. GRIDDINE,**

       **Plaintiff,**

       **v.**

**GP1 KS-SB, INC., d/b/a Baron BMW and
GROUP 1 AUTOMOTIVE,**

       **Defendants.**

**Case No. 2:17-CV-02138-JAR**

## MEMORANDUM AND ORDER

Plaintiff Thomas Griddine brings this employment action against Defendants GP1 KS-SB, Inc., d/b/a Baron BMW ("Baron") and Group 1 Automotive. Griddine, a former employee of Baron, claims that Defendants discriminated against him on the basis of age, resulting in his constructive discharge from Baron. Now before the Court are Defendants' Motion for Summary Judgment (Doc. 77) and Griddine's Motion for Summary Judgment on Affirmative Defense of After-Acquired Evidence (Doc. 79). The motions are fully briefed and the Court is prepared to rule.

In his Amended Complaint, Griddine asserted claims for constructive discharge on the basis of age in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.* ("ADEA") (Count I), retaliation under the ADEA (Count II), race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Count III), retaliation under Title VII (Count IV), race discrimination under 42 U.S.C. § 1981 (Count V), and retaliation under § 1981 (Count VI).[1] In his response to Defendants' motion for summary judgment,

---

[1] Doc. 6 at 6–11.

however, Griddine states that he is "elect[ing] not to oppose the Defendants' motion with respect to Counts II through VI."[2]  Thus, Griddine's only remaining claim is for constructive discharge on the basis of age (Count 1) and his other claims are dismissed with prejudice.  For the reasons set forth in detail below, Defendants are also entitled to summary judgment on Count I and this case is dismissed with prejudice in its entirety.  The Court therefore denies as moot Griddine's Motion for Summary Judgment on Affirmative Defense of After-Acquired Evidence.

## I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[3] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[4]  "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[5]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[6]  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[7]

---

[2] Doc. 86 at 1.

[3] Fed. R. Civ. P. 56(a).

[4] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1210 (10th Cir. 2008)).

[5] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[6] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[7] *Adler,* 144 F.3d at 670 (citing *Anderson,* 477 U.S. at 248).

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[8]  In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.[9]

Once the movant has met the initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[10]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[11]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[12]  In setting forth these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[13]  To successfully oppose summary judgment, the nonmovant must bring forward "more than a mere scintilla of evidence" in support of his position.[14]  A nonmovant "cannot create a genuine issue

[8] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied,* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[9] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (citation omitted).

[10] *Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[11] *Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001) (citation omitted).

[12] *Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 670–71); *see Kannady,* 590 F.3d at 1169.

[13] *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992), *cert. denied,* 506 U.S. 1013 (1992)).

[14] *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1539 (10th Cir. 1993).

of material fact with unsupported, conclusory allegations"[15] or evidence based on mere "speculation, conjecture, or surmise."[16]  Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[17]

## II.    Evidentiary Objections to Statements of Fact

Before turning the parties' statements of fact, the Court must resolve both sides' objections to certain evidence offered by the opposing party.

### A.    Griddine's Objections to Stockwood Declaration Under Federal Rules of Civil Procedure 56(c) and 37(c)(1)

In support of their motion for summary judgment, Defendants offer the Declaration of Julie Stockwood, Baron's Human Resources Manager.  Griddine objects to certain statements in Stockwood's Declaration on the basis that they are not supported by admissible evidence as required by Fed. R. Civ. P. 56(c)(2), are not based on personal knowledge as required by Fed. R. Civ. P. 56(c)(4), and/or are inadmissible under Fed. R. Civ. P. 37(c)(1) because they rely on evidence that Defendants failed to produce in compliance with Fed. R. Civ. P. 26.

---

[15] *Tapia v. City of Albuquerque*, 170 F. App'x 529, 533 (10th Cir. 2006) (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004); *Karlin v. Paul Revere Life Ins. Co.*, 742 F. Supp. 2d 1253, 1256 (D. Kan. 2010) (citing Fed. R. Civ. P. 56(e); *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) ("The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.").

[16] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999), *cert. denied*, 528 U.S. 933 (1999); *Allen v. Muskogee*, 119 F.3d 837, 846 (10th Cir. 1997), *cert. denied,* 522 U.S. 1148 (1998)).

[17] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1) (other citation omitted).

Summary judgment evidence need not be "submitted 'in a form that would be admissible at trial.'"[18] However, "the content or substance of the evidence must be admissible,"[19] and Rule 56(c)(2) permits a party to "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."[20] "Indeed, as the advisory committee notes to the 2010 Federal Rule amendments explain: 'The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.'"[21] "The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form."[22]

Further, Rule 56(c)(4) provides that "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."[23] Similarly, D. Kan. Rule 56.1(d) provides that "[a]ffidavits or declarations must be made on personal knowledge and by a person competent to testify to the facts stated that are admissible in evidence."[24] Finally, Rule 602 of the Federal Rules of Evidence provides that "[a] witness may

---

[18] *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)).

[19] *Id*. (quoting *Argo*, 452 F.3d at 1199).

[20] Fed. R. Civ. P. 56(c)(2).

[21] *Draughon v. United States*, Case No. 14-2264-JAR-GLR, 2017 WL 3492313, at *8 (D. Kan. Aug. 15, 2017) (quoting Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment).

[22] *Id*. (quoting *Brown*, 835 F.3d at 1232 and citing *O'Connor v. Williams*, 640 F. App'x 747, 750 (10th Cir. 2016)).

[23] Fed. R. Civ. P. 56(c)(4).

[24] D. Kan. Rule 56.1(d).

testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."[25]

"Although affidavits are entirely proper on summary judgment, the content or substance of the evidence contained therein must be admissible."[26] And "[u]nder the personal knowledge standard, an affidavit is inadmissible if 'the witness could not have actually perceived or observed that which he testifies to.'"[27] Thus, an affidavit "asserting personal knowledge must include enough factual support to show that the affiant possesses that knowledge,"[28] meaning that the affiant must "affirmatively set forth the bases upon which [he or she] relies . . . in making the statements asserted."[29] However, Rule 56(c)(4)'s "requirements of personal knowledge and competence to testify may be inferred if it is clear from the context of the affidavit that the affiant is testifying from personal knowledge."[30]

---

[25] Fed. R. Evid. 602.

[26] *Hansen v. PT Bank Negara Indonesia (Persero)*, 706 F.3d 1244, 1250 (10th Cir. 2013) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 327 (1986); *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995); Fed. R. Civ. P. 56(c)(4)).

[27] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (quoting *United States v. Sinclair*, 109 F.3d 1527, 1536 (10th Cir. 1997)); *Ney v. City of Hoisington, Kan.*, 508 F. Supp. 2d 877, 883 (D. Kan. 2007), *aff'd*, 264 F. App'x 678 (10th Cir. 2008) (citing *Argo*, 452 F.3d at 1200).

[28] *Guinan v. Boehringer Ingelheim Vetmedica, Inc.*, 803 F. Supp. 2d 984, 992 (N.D. Iowa 2011) (quoting *El Deeb v. Univ. of Minn.*, 60 F.3d 423, 428 (8th Cir. 1995)).

[29] *Glenn v. Proctor & Gamble Co.*, Case No. 07-4144-EFM, 2009 WL 10688943, at *11 (D. Kan. Sept. 10, 2009); *see also Hansen*, 706 F.3d at 1250–51 (finding district court did not err in excluding declaration that failed to explain how declarant had personal knowledge of the matters asserted); *Alexander v. Kellogg USA, Inc.*, 674 F. App'x 496, 499 (6th Cir. 2017) (citations omitted) (stating that the party offering the affidavit bears the burden of "show[ing] circumstances indicating the [affiant] has based the statement on personal knowledge," meaning "personal observations or experiences").

[30] *Univ. of Kan. v. Sinks*, 565 F. Supp. 2d 1216, 1227 (D. Kan. 2008) (quoting *Told v. Tig Premier Ins. Co.*, 149 F. App'x 722, 725 (10th Cir. 2005)); *see also Alexander*, 674 F. App'x at 499 (noting that "courts may infer personal knowledge from the content and context of an affidavit"); *Riggs v. City of Owensville*, No. 4:10-CV-793 CAS, 2011 WL 1743691, at *2 (E.D. Mo. May 4, 2011) (quoting *Brooks v. Tri-Systems, Inc.*, 425 F.3d 1109, 1111–12 (8th Cir. 2005) ("'In some instances, courts will infer personal knowledge from the content or context of a statement in an affidavit,' where the content or context support an inference that it reflects the affiant's personal knowledge."). In paragraphs 3-10 and 18 of her Declaration, Stockwood provides employment-related and demographic information about various Baron employees, including Griddine. In relevant part, she states the names, birth dates, positions

---

6

In the first paragraph of her Declaration, Stockwood states that she has been Baron's Human Resources Manager since "early 2016," which means that she began working at Baron only a few months before Griddine resigned his employment there in April of 2016.[31] In the second paragraph of her Declaration, Stockwood states: "I am over eighteen years of age, am of sound mind, and am competent to make this declaration. I have personal knowledge of the facts stated herein."[32] This statement is Stockwood's only attempt at establishing that she has personal knowledge of the facts to which she attests. And this statement, standing alone without factual support, is insufficient to establish personal knowledge.[33] Accordingly, many of Stockwood's statements are inadmissible as set forth below.

In paragraphs 11-13, Stockwood provides "the average closing ratio" for different kinds of customer leads (*i.e.*, internet, showroom, and phone leads), and purports to base this information on unspecified documents or data from Baron's Customer Relations Management ("CRM") system. In paragraphs 14-16, she states various facts about the typical content of internet leads, and Baron's receipt of and practices for distributing such leads among Client Advisors. In paragraph 17, Stockwood describes Baron's "Customer Protective Policy," which she states generally protects a prospective client who has made contact with a Client Advisor

---

held, and supervisors for these employees, as well as the total number of Client Advisors who worked in the Pre-Owned Sales Department from January through May 2016. Declaration of Julie Stockwood, Doc. 78-3, ¶¶ 3–10, 18 ("Stockwood Declaration"). Griddine raises no evidentiary objections to these statements and, in any event, the Court finds Stockwood's personal knowledge of such basic employment-related facts can be inferred from her position as Baron's Human Resources Manager. Griddine also not does object to and the Court will consider paragraph 20, which concerns a personal interaction between Stockwood and Griddine. *Id.*, ¶ 20. Other paragraphs of Stockwood's Declaration are immaterial to Griddine's sole remaining claim.

[31] Stockwood Declaration, Doc. 78-3, ¶ 1.

[32] *Id.*, ¶ 2.

[33] *See Glenn*, 2009 WL 10688943, at *11 (citing *Litton v. Maverick Paper Co.*, 388 F. Supp. 2d 1261, 1269 n.3 (D. Kan. 2005)) ("While it is true that [the affiant] did state that all of the statements in the affidavit are based on personal knowledge, this Court has held that merely making this statement does not meet the showing required by Fed. R. Civ. P. 56[(c)(4)].").

from being assigned to or taken by another Client Advisor for a specified period of time, subject to certain exceptions.  In paragraph 19, Stockwood discusses a situation in which a customer with whom Griddine had previously met was reassigned to a different Client Advisor, again purportedly basing her statements on unspecified data from the CRM system.  Nowhere, however, does Stockwood describe how she—in her role in human resources, not sales—has acquired personal knowledge of the CRM system or data extracted therefrom, the handling of customer leads, or the implementation of any "Customer Protective Policy."  Nor can the Court infer from her position as Human Resources Manager that she would necessarily have personal knowledge of these matters, which relate to Baron's sales efforts.

In response to Griddine's objection to the foregoing paragraphs of Stockwood's Declaration, Defendants state that Griddine's assertion that Stockwood lacks personal knowledge is "speculative,"[34] and that "[i]t seems obvious that the HR Manager for the dealership would have knowledge of the general operating procedures within the dealership, including in the Pre-Owned Sales Department, and that Stockwood would have acquired further and more specific information about all of these matters in relation to her dealings with Griddine."[35]  Whether it seems obvious to Defendants that Stockwood would have personal knowledge is not the test.  Rather, as the proponents of Stockwood's Declaration, Defendants bear the burden of showing that she has based her statements on personal experience or observations.  Defendants have not met this burden as to paragraphs 11-17 and 19.  The Court therefore will not consider these statements in accordance with Rule 56(c).

---

[34] Doc. 88 at 3.

[35] *Id.* at 2, n2.

Griddine's objections to paragraphs 11-13 and 19 of Stockwood's Declaration pursuant to Rule 37(c)(1) are also well taken. Griddine argues that these statements are inadmissible because they rely on evidence that Defendants failed to produce prior to the discovery cut-off, specifically "pages or files" from Baron's CRM system.[36] Fed. R. Civ. P. 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."[37]

A district court has discretion in deciding whether a Rule 26 violation is harmless or substantially justified.[38] In so deciding, the Court examines several factors: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness."[39] The burden to demonstrate that the failure to disclose is harmless or substantially justified is on the party who failed to properly disclose.[40] Defendants make no attempt to demonstrate that their failure to disclose CRM system data was harmless or substantially justified, choosing instead to rely on alternative evidence to support certain of the

---

[36] Doc. 86 at 4, 7.

[37] Fed. R. Civ. P. 37(c)(1); *see also Vesom v. Atchison Hosp. Ass'n*, 279 F. App'x 624, 631 (10th Cir. 2008), *cert. denied*, 555 U.S. 970 (2008).

[38] *Guang Dong Light Headgear Factory Co., Ltd. v. ACI Int'l, Inc.*, No. 03-4165-JAR, 2008 WL 53665, at *1 (D. Kan. Jan. 2, 2008) (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002), *cert. denied,* 537 U.S. 1066 (2002)) ("Whether a violation of Rule 26(a) is 'substantially justified' or 'harmless' is left to the broad discretion of the Court.").

[39] *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1130 (10th Cir. 2011) (quoting *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999)).

[40] *Paliwoda v. Showman*, No. 12-2740-KGS, 2014 WL 3925508, at *5 (D. Kan. Aug. 12, 2014) (citing *A.H. v. Knowledge Learning Corp.*, No. 09-2517-DJW, 2010 WL 4272844, at *5 (D. Kan. Oct. 25, 2010)).

statements of fact in question.[41]  The Court therefore declines to consider paragraphs 11-13 and

19 based on Rule 37(c)(1) in addition to Rule 56(c).

**B.      Defendants' Hearsay and Rule 56(c) Objections to Griddine's Evidence**

**1.      Deposition Testimony of Pennie Murray, Ph.D.**

Griddine cites to the deposition testimony of Pennie Murray, Ph.D.—his "peer coach" or

"co-coach"—to support his contention that he was discriminated against and that his working

conditions at Baron deteriorated to the point that he was forced to resign.  Specifically, Griddine

relies upon Dr. Murray's testimony about how he described his work situation to her, what he

told her were the sources of his problems at work, and what he told her about the mental and

physical effects these issues had upon him.[42]  Dr. Murray testified that she had no personal, first-

hand knowledge of events that transpired at Baron, and that her only knowledge was based on

what Griddine told her.[43]  Defendants object to Dr. Murray's deposition testimony about what

Griddine said to her on the basis that it consists of inadmissible hearsay.

Hearsay is a statement that the declarant does not make while testifying at the current

trial or hearing and that a party offers to prove the truth of the matter asserted.[44]  Under Fed. R.

Evid. 802, hearsay is inadmissible except as provided by law.[45]  Again, summary judgment

---

[41] *See* Doc. 88 at 4–5 ("Griddine attempts to controvert this fact by stating . . . that the data from the Customer Relations Management System ("CRM") that is referenced in Stockwood's Declaration is inadmissible because the records were not produced in discovery.  Even without reference to the CRM data, the cited deposition testimony . . . supports the closing percentages identified in SOF 33.").  Defendant's Statement of Fact 33 relies on paragraphs 11-13 of Stockwood's Declaration; Defendants do not address Griddine's Rule 37 objection to paragraph 19 of the Declaration, which Defendants cite in support of their Statement of Fact 46.

[42] Doc. 86 at 9–10, ¶¶ 73–78.

[43] Deposition of Pennie Murray, Ph.D., Doc. 88-1 at 65:3–6 ("Murray Deposition").

[44] Fed. R. Evid. 801(c).

[45] Fed. R. Evid. 802 ("Hearsay is inadmissible unless any of the following provides otherwise: a federal statute; these rules; or other rules prescribed by the Supreme Court.")

evidence need not be "submitted 'in a form that would be admissible at trial,'"[46] but "the content or substance of the evidence must be admissible."[47] "Fed. R. Civ. P. 56(c)(1)(A) specifically permits a party to support its factual assertions by means of a deposition transcript or affidavit, even though these are forms of evidence that are usually inadmissible as hearsay at trial."[48] "Courts, however, should disregard any inadmissible statements (e.g., hearsay) contained *within* affidavits or deposition transcripts that could not be presented at trial in any form."[49] "Thus, although evidence presented in the form of an affidavit or deposition at the summary judgment stage can be 'converted' in form into live testimony at trial, the content or substance must be otherwise admissible, and any hearsay contained in an affidavit or deposition remains hearsay beyond a court's consideration."[50]

Dr. Murray's deposition testimony about statements Griddine made to her consists of inadmissible hearsay unless an exception to the rule against hearsay applies. Without expressly saying so, Defendants appear to argue that the exception provided for in Fed. R. Evid. 803(4)—

[46] *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)).

[47] *Id*. (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc*., 452 F.3d 1193, 1199 (10th Cir. 2006)).

[48] *Wunder v. Elettric 80, Inc*., No. 13-4014-KGS, 2014 WL 4059763, at *2 (D. Kan. Aug. 15, 2014) (citing *Dodson Aviation, Inc. v. HLMP Aviation Corp*., No. 08-4102-KGS, 2011 WL 1234705, at *8 (D. Kan. Mar. 31, 2011); *Garcia-Martinez v. City & Cty. of Denver*, 392 F.3d 1187, 1191 (10th Cir. 2004)).

[49] *Id*. (citing *Dodson*, 2011 WL 1234705, at *9) (emphasis in original); *see Starr v. Pearle Vision, Inc*., 54 F.3d 1548, 1555 (10th Cir. 1995) (holding that "Rule 56 precludes the use of in admissible hearsay testimony in depositions submitted in support of, or in opposition to, summary judgment").

[50] *Wunder*, 2014 WL 4059763, at *2 (citing *Dodson*, 2011 WL 1234705, at *9); *see Brown v. Lowe's Home Ctrs*., 627 F. App'x 720, 724 (10th Cir.), *cert. denied*, 136 S.Ct. 2413 (2016), *and reh'g denied*, 137 S.Ct. 27 (2016) (citing *Riggs v. AirTran Airways, Inc*., 497 F.3d 1108, 1121 (10th Cir. 2007) (stating that "inadmissible hearsay . . . cannot be used to oppose summary judgment"); *Wright-Simmons v. City of Okla. City*, 155 F.3d 1264, 1268 (10th Cir. 1998) (quoting *Thomas v. IBM*, 48 F.3d 478, 485 (10th Cir. 1995) ("Hearsay testimony cannot be considered because a third party's description of a witness' supposed testimony is 'not suitable grist for the summary judgment mill.'"); *Lawson v. Potter*, Case No. 08-CV-04052-JAR-KGS, 2010 WL 11564954, at *3 (D. Kan. Mar. 3, 2010) (holding that statements by physician, "introduced through plaintiff's deposition testimony, constitute hearsay and will not be considered by the Court on summary judgment").

pertaining to statements made for medical diagnosis or treatment—does not apply here.[51]  While

Rule 803(4) may extend to statements made to mental health professionals,[52] Dr. Murray

testified that she provides neither medical treatment nor psychological counseling.  Dr. Murray

testified that she is "absolutely not" a physician, holds no license relating to psychological

counseling or clinical social work, and does not claim to provide any kind of psychological

counseling.[53]  Rather, Dr. Murray testified that she is a "self-healing activist," that her area of

expertise is "emotional awareness," and that her approach to working with Griddine involved

"[m]ore of a holistic approach to work/life balance."[54]  The Court agrees with Defendants that

this exception does not apply here in the context of the "peer coaching" Dr. Murray provided to

Griddine, as contrasted with medical diagnosis or treatment.[55]

　　　　The Court also finds, however, that under the Fed. R. Evid. 803(3) exception for

statements of the declarant's then-existing mental, emotional, or physical condition, certain of

Griddine's statements to Dr. Murray are admissible to show his state of mind at the time of the

---

[51] *See* Fed. R. Evid. 803(4) (excepting from rule against hearsay "[a] statement that: (A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and (2) describes past medical history; past or present symptoms or sensations; their inception; or their general cause.").

[52] *United States v. Gonzales*, 905 F.3d 165, 199 (3d Cir. 2018) (collecting cases) ("The decisions of our sister Courts of Appeals support this conclusion, as every Court of Appeals to consider this issue has determined that statements made to a mental health professional for purposes of diagnosis or treatment qualify under the hearsay exception in Rule 803(4).").

[53] Murray Deposition, Doc. 88-1 at 48:9–23.

[54] *Id.* at 50:9–51:18.

[55] Although the advisory committee notes to Rule 803(4) state that "under the exception the statement need not have been made to a physician," the Rule does require that the statement have been made "for purposes of diagnosis and treatment."  *See* Fed. R. Evid. 803(4), advisory committee's note to 1972 proposed rules; *see also United States v. Tome*, 61 F.3d 1446, 1451 (10th Cir. 1995) (citing 2 McCormick on Evid. § 277 (7th ed.)) (stating that "the test for admissibility under Rule 803(4) is 'whether the subject matter of the statements is reasonably pertinent to diagnosis or treatment.'").

statement, though not to establish the *reason* for his state of mind. Rule 803(3) excepts from the rule against hearsay

> [a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will.[56]

"Rule 803(3) clearly sanctions the admission of a declarant's out-of-court statement concerning [his] then-existing state of mind."[57] However, "[t]he state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind."[58]

Finding no other potentially applicable exception to or exclusion from the rule against hearsay, the Court does not consider Dr. Murray's statements about what Griddine said to her during their coaching sessions where those statements are offered for the truth of the matter asserted, with the exception of statements regarding Griddine's then-existing state of mind or emotional, sensory, or physical condition.[59]

---

[56] Fed. R. Evid. 803(3).

[57] *United States v. Joe*, 8 F.3d 1488, 1492 (10th Cir. 1993), *cert. denied*, 510 U.S. 1184 (1994) (citing *United States v. Donley*, 878 F.2d 735, 737 (3d Cir. 1989), *cert. denied*, 494 U.S. 1058 (1990)).

[58] *Id.* at 1493 (quoting *United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980), *reh'g denied*, 636 F.2d 315 (5th Cir. 1981)).

[59] The Court also declines to consider Dr. Murray's testimony to the extent that it is conclusory and/or speculative, *i.e.*, her testimony that Griddine told her that his challenges at work related to "biases, prejudices or favoritism." Murray Deposition, Doc. 86-1 at 64:5–12.

## 2. Declaration of Thomas E. Griddine and Summary Charts

Griddine submits a declaration in support of his own statements of fact, attached to which are two charts that he apparently prepared himself concerning the hours he and three other Client Advisors worked during twenty-six pay periods from April 2015 to April 2016.[60] The two charts are not labeled, do not explain how they are different, and contain various calculations comparing Griddine's hours worked to those worked by his peers. For example, in addition to tracking overall hours worked, Griddine attempts to calculate how many times Client Advisors worked less than forty hours in a week or clocked in early or late.

Griddine's Declaration states that his "personal knowledge of the facts declared in this declaration and in the two charts attached to this declaration is derived from documents produced by Defendants in this lawsuit during the discovery phase of the case."[61] Although Griddine provides the bates range for the documents in question and states that they "appear to be true and accurate records maintained during the ordinary and regular course of business at Baron BMW," he does not state what these documents consist of or attach them for the Court's review.[62] He concludes his Declaration by stating that the "declaration and [his] review of the referenced documents are intended to satisfy the requirements of Fed. R. Evid. 1006."[63]

Defendants object to Griddine's Declaration on the ground that he lacks personal knowledge of the matters to which he attests in violation of Rule 56(c)(4), and because the two

---

[60] Declaration Thomas E. Griddine, Doc. 86-4 ("Griddine Declaration").

[61] *Id.*, ¶ 3.

[62] *Id.*, ¶¶ 4–5. These documents are not among those that the parties' have stipulated are admissible. *See* Pretrial Order, Doc. 72 at 5–6.

[63] Griddine Declaration, Doc. 86-4, ¶ 6.

charts prepared by Griddine are unclear, unverifiable, and based on documents produced by Defendants that Griddine has failed to authenticate.

Fed. R. Evid. 1006 provides that "[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court."[64] However, "[i]n order for a summary to be admissible, it must be drawn from records that are otherwise admissible."[65] As the proponent of the charts, the burden is on Griddine to "lay a proper foundation for the admission of the original materials upon which the exhibit is based."[66] Rule 1006 "[s]ummaries must be accurate and non-prejudicial,"[67] and must be "limited to what is actually within the content of the underlying documents. The summaries shall not include any testimonial, interpretive, or inferential statements drawn from the content of the underlying documents."[68] "The admission of summaries under Fed. R. Evid. 1006 is within the sound discretion of the trial court,"[69] and here,

---

[64] Fed. R. Evid. 1006. The rule further provides that "[t]he proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court."

[65] *Trans-Rim Enters. (USA), Ltd. v. Adolph Coors Co*., No. 94-1236, 1995 WL 231381, at *3 (10th Cir. Apr. 7, 1995) (citing *Harris Mkt. Research v. Marshall Mktg. and Commc'ns, In*c., 948 F.2d 1518, 1525 (10th Cir. 1991); 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 1006[03] (1994)); *see also United States v. Channon*, 881 F.3d 806, 810 (10th Cir.), *cert. denied*, 139 S.Ct. 137 (2018), *and cert. denied*, 139 S.Ct. 138 (2018) (citing *United States v. Irvin*, 682 F.3d 1254, 1261 (10th Cir. 2012)) ("Although the information upon which a Rule 1006 summary is created need not itself be admitted into evidence, it must still be admissible.").

[66] *United States v. Anderson*, Case No. 96-7044, 1996 WL 740845, at *2 (10th Cir. Dec. 27, 1996) (citing *Harris*, 948 F.2d at 1525).

[67] *Daniel v. Ben E. Keith Co*., 97 F.3d 1329, 1335 (10th Cir. 1996); *see also State Office Sys., Inc. v. Olivetti Corp. of Am*., 762 F.2d 843, 846 (10th Cir. 1985) ("[A] summary of business records should not be admitted if it mischaracterizes or inaccurately reflects the documents it purports to summarize.").

[68] *United States v. Miller*, No. 06-40068-JAR, 2010 WL 235034, at *3 (D. Kan. Jan. 15, 2010).

[69] *United States v. Thompson*, 518 F.3d 832, 858 (10th Cir. 2008), *cert. denied*, 555 U.S. 993 (2008) (quoting *Harris*, 948 F.2d at 1525).

the Court finds that Griddine has failed to (1) lay a proper foundation for the admission of the documents underlying his charts, and (2) establish the proper application of Rule 1006.

The documents Griddine used to create his charts—which he states "appear to be true and accurate records maintained during the ordinary and regular course of business at Baron BMW"[70]—may be business records that fall within the Fed. R. Evid. 803(6) exception to the hearsay rule or statements of a party opponent that fall within the Fed. R. Evid. 801(d)(2)(A) exception.[71] Further, "[d]ocuments produced during discovery that are on the letterhead of the opposing, producing party are authentic *per se* under Rule 901 of the Federal Rules of Evidence."[72] Thus, while the documents Griddine relied upon in creating his charts might be admissible—and his review of those documents might be sufficient to establish personal knowledge of their contents under Fed. R. Civ. P. 56 and Fed. R. Evid. 602—Griddine's Declaration does not provide enough information for the Court to make this assessment and, therefore, he has failed to lay a proper foundation for the admission of those documents.[73]

---

[70] Griddine Declaration, Doc. 86-4, ¶ 5.

[71] *See Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1123 (10th Cir. 2005); Fed. Rule Evid. 803(6) (excluding from rule against hearsay "[a] record of an act, event, condition, opinion, or diagnosis if: (A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all of these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness"); Fed. R. Evid. 801(d)(2)(A) (providing that hearsay does not include a statement offered against an opposing party where statement was made by that party in an individual or representative capacity).

[72] *Miller v. NEP Group, Inc.*, Case No. 15-CV-9701-JAR, 2017 WL 2151843, at *2 (D. Kan. May 17, 2017) (citing *Law Co. v. Mohawk Const. and Supply Co.*, 577 F.3d 1164, 1170 (10th Cir. 2009)).

[73] *See Bryant*, 432 F.3d at 1121–24 (finding that district court should have considered plaintiff's affidavit in opposition to summary judgment, where affidavit summarizing audit data attached both spreadsheet compiled by plaintiff based on defendant's records and underlying audit data); *Serv. Emps. Int'l Union Nat'l Indus. Pension Fund v. Bristol Manner Healthcare Ctr., Inc.*, 153 F. Supp. 3d 363, 374 (D. D.C. 2016) (allowing summary spreadsheets at summary judgment where plaintiffs had produced a "'significant sample' of the[] underlying documents . . . [totaling] nearly two hundred pages of documentation.").

Although Griddine provides a bates range for the documents in question, he neither states precisely what they are nor attaches them, and the Court is left without a clear picture of the source, nature, or content of the underlying material.[74]

Further, Griddine has not established the applicability of Fed. R. Evid. 1006. First, it is not clear to the Court, without seeing any of the 223 pages of documents in question, that those documents are so voluminous as to require a summary,[75] nor can the Court assess whether Griddine has accurately summarized those documents in his charts, which are difficult to decipher. Second, Griddine's charts appear to include some "'analysis' of the underlying evidence, rather than simply a summary of that evidence."[76] Accordingly, the Court will not consider Griddine's Declaration or the charts attached thereto.[77]

## III.    Uncontroverted Facts

Having resolved the foregoing evidentiary issues, the Court turns to the parties' statements of fact, keeping in mind that factual disputes about immaterial matters are not relevant to a summary judgment determination; rather, immaterial facts and factual averments

---

[74] *United States v. Miller*, No. 06-40068-JAR, 2010 WL 235034, at *1 ("Typically, summaries of documents offered in lieu of the documents under Rule 1006 contain a detailed description of the documents for which the summaries are being admitted.").

[75] *See, e.g., United States v. Thompson*, 518 F.3d 832, 859 (10th Cir. 2008), *cert. denied*, 555 U.S. 993 (2008) (finding trial court did not err in admitting summaries where the "evidence was incredibly voluminous, and it would have been incomprehensible to the jury without summarization"); *Service Emps. Int'l Union Nat'l Indus. Pension Fund*, 153 F. Supp. 3d at 374 (citation omitted) ("Evidence under Rule 1006 must summarize underlying documents so voluminous that comprehension would be 'difficult' and 'inconvenient,' though not necessarily 'literally impossible.'").

[76] *Stafford v. United States*, No. 3:12-cv-0909, 2013 WL 140605, at *11 (M.D. Tenn. Jan. 11, 2013); *see also Miller*, 2010 WL 235034, at *3.

[77] It appears to the Court that the purpose behind Griddine's charts is to attempt to establish that he worked more overall hours than other Client Advisors and, therefore, should have had a higher number of a certain type of sales lead. As discussed below, even if he could show some evidence of discriminatory animus, Griddine still cannot meet the stringent test for constructive discharge because he lacks proof that Defendants made his working conditions so difficult that a reasonable person in his position would feel compelled to resign. The exclusion of Griddine's charts—and of Dr. Murray's testimony—does not affect the ultimate outcome of this case.

not supported by the record are omitted.[78]  If controverted, the facts are construed in the light most favorable to the plaintiff.[79]  However, as noted above and as particularly relevant here, a plaintiff's opinions and subjective interpretations of the evidence are insufficient to oppose summary judgment.[80]  "Unsubstantiated allegations carry no probative weight in summary judgment proceedings."[81]  Rather, "[t]o defeat a motion for summary judgment, evidence, including testimony, must be more than mere speculation, conjecture, or surmise."[82]  Although Griddine's contentions in the Pretrial Order are not uncontested facts, the Court includes them at the start of each subsection below to provide context.

## A.     The Parties

Defendant GP1 KS-SB, Inc., d/b/a Baron BMW ("Baron"), is an automotive dealership located in Merriam, Kansas that specializes in the sale and service of new and pre-owned BMW vehicles.  Defendant Group 1 Automotive, Inc., headquartered in Houston, Texas, owns and operates collision centers, franchises, and automotive dealerships throughout the United States,

---

[78] *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1361 (10th Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Because Griddine does not oppose Defendants' motion for summary judgment with regard to Counts II through VI, the Court does not include facts relating solely to those counts.

[79] *Id.* (citing *Anderson*, 477 U.S. at 255).

[80] *See, e.g.*, *Thompson v. Wilkie*, Case No. 18-4046-SAC-KGS, 2018 WL 5281609 at *4 (D. Kan. Oct. 24, 2018) (citing *Mann v. Turner Bros., Inc.*, 560 F. App'x 743, 747 (10th Cir. 2014); *Rojas v. Anderson*, 727 F.3d 1000, 1003 n.4 (10th Cir. 2013), *cert. denied*, 571 U.S. 1095 (2013); *Tran v. Sonic Indus. Servs., Inc.*, 490 F. App'x 115, 120–21 (10th Cir. 2012)); *Karlin v. Paul Revere Life Ins. Co.*, 742 F. Supp. 2d 1253, 1256 (D. Kan. 2010) (citing Fed. R. Civ. P. 56(e); *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)).

[81] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Phillips v. Calhoun*, 956 F.2d 949, 951 n.3 (10th Cir. 1992)).

[82] *Id.* (citing *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir. 1999), *cert. denied*, 528 U.S. 933 (1999); *Allen v. Muskogee*, 119 F.3d 837, 846 (10th Cir. 1997), *cert. denied,* 522 U.S. 1148 (1998)).  The Court also reminds the parties that Rule 56(c) requires them to support their factual positions by citing to record, and this means that when a party cites to deposition testimony, that testimony should say what the party purports that it says and/or support the point for which it is cited.  Because the parties have sometimes mischaracterized the testimony cited, the Court has been forced to quote at length from the depositions and to expend an unreasonable amount of time reconciling the parties' statements of fact.

including Baron. Group 1 Automotive and Baron are separately incorporated, and Baron was Griddine's employer during the entirety of the time period in question.

Plaintiff Thomas Griddine is an African American male. On January 5, 2015, Steve Zeigler, Baron's Pre-Owned Sales Manager, hired Griddine as a Client Advisor in the Pre-Owned Car Sales Department. Griddine was fifty-five years old when he began his employment with Baron. Griddine was supervised by Zeigler, until Zeigler left Baron on March 31, 2016, and by Assistant Pre-Owned Sales Manager, Steve Genova, until Genova left Baron on March 1, 2016. Following the departure of Zeigler and Genova, Griddine reported to Baron's General Sales Manager, Brad Pointer.

### B. Griddine's Desk Placement

In or about June 2015, Zeigler moved Griddine's desk to the back of the Pre-Owned Car Sales Department area, and Griddine contends that this "unfavorable placement in his desk assignment"[83] obscured his view of arriving customers. Griddine concedes that when his desk was moved to the Pre-Owned Car Sales Department, other Client Advisors also had their desks located in that department. He also testified that other Client Advisors moved desk locations while he worked at Baron, but he does not know why those Client Advisors' desk assignments changed.

### C. Lead Distribution and "House" Deals

Griddine contends that he was subjected to "[u]nfavorable distribution of customer leads that came to the dealership through the internet and through 'house' deals under the round-robin

---

[83] Pretrial Order, Doc. 72 at 6.

format used by management," and "unfavorable distribution of customer leads that came to the dealership through the internet on the basis of leads that were more likely to result in sales."[84]

Sales leads from prospective Baron customers are obtained, among other methods, by walk-in traffic at the dealership (showroom leads), by telephone, or via the internet. A showroom lead occurs when a prospective customer walks onto the Baron lot or into the showroom. A Client Advisor who is present in the dealership and not otherwise busy with another customer obtains a showroom lead by greeting a customer who walks onto the lot or into the showroom. A telephone lead occurs when a prospective customer calls the dealership. The receptionist answers the phone, determines whether the potential customer is interested in new or used cars, and then transfers the call to the appropriate department. When a customer call is transferred to the Pre-Owned Car Sales Department, all of the Pre-Owned Client Advisors' phones ring at the same time, and the first Client Advisor to pick up the phone receives the lead.

Griddine testified that the term "house deal" refers to "where maybe you're the manager and one of your friends wants to buy a car and so he calls you up and says, hey, I want to come over and buy a car. Well, then that manager gives that customer to someone, one of the client advisors."[85] Again, Griddine contends that "house deals" were to be assigned to Client Advisors using a "round robin" format.[86]

Genova testified regarding a distinction between a "house deal" and a "referral from service." He described a "house deal" as when he, a manager,

---

[84] *Id*. at 6–7.

[85] Deposition of Thomas E. Griddine, Doc. 78-1 at 83:17–23 ("Griddine Deposition").

[86] Pretrial Order, Doc. 72 at 6.

> personally would have a friend, relative, or somebody that I know that is looking for a car, they want to buy a vehicle, and I've pretty much have the deal done. In other words, I have negotiated the deal, I have worked out all the numbers, have appraised their trade, if there is a trade, and if you're on a pre-owned vehicle, have told them what the vehicle is, given them a price on the vehicle, and really the only thing that's really left to do is to maybe take them on a demo drive and then finish doing all the paperwork. That's my determination of what a house deal is.[87]

Regarding whether "house deals" would be assigned to Client Advisors, Genova testified:

> If I did the entire process, and did everything and did all the paperwork from beginning to end, which me, it's not uncommon for me to do that, but I wouldn't do it all the time, I would make that a house deal under "Other," and no assignment to a client advisor would be given. In other words, they're not going to get paid on the deal, they're not getting any commission, because no client advisor did anything on the deal, other than me, as a manager. I personally wanted to take care of them.[88]

Genova testified that referrals from *non-manager* employees of Baron are not "house deals," but "referrals from service," and that these referrals are assigned to Client Advisors who are available at the time:

> Q: Even though that's not a house deal, would you then assign out that referral to one of the client advisors?
>
> A: Whoever was standing there and was available, absolutely, yes.
>
> Q: It doesn't sound like that would be a part of the round-robin format, then—
>
> A: No.
>
> Q: —if it's just somebody who's—
>
> A: No, sir.
>
> Q: —within your eyesight?

---

[87] Deposition of Stephen C. Genova, Doc. 78-4 at 58:4–16 ("Genova Deposition").

[88] *Id.* at 58:21–59:6.

A: No. Who's ever right there, not busy, if they need to—and needed help, we needed somebody to help them, if they're there, and they're not busy, and we can see where they're at, if we can't find somebody, we'll go try to find another pre-own client advisor if they're on a pre-owned car—

Q: Right.

A: —and then make sure that they're getting help, but that's not a house deal. That's a referral from service, and then it's up to the client advisor to figure out a way to sell them a car.[89]

Zeigler testified—in apparent contradiction to Genova's testimony—that referrals from non-manager employees are included within his definition of the term "house deal":

Q: . . . House sale was a sale made to an employee or nonclient adviser's/employee's family member, friend, friend of a manager, or to a previous customer whose client advisor was no longer with the dealership? Do you see that?

A: Yes.

Q: Is that an accurate definition of what a house sale was?

A: Kind of, except the last when you talked about friend—previous customer, no. That's not—it wouldn't be a house sale. You assign them to a client, or one of the client advisers or sales people.[90]

Zeigler testified that Baron had "[m]aybe one [house deal] a month, maybe," though it is unclear exactly which type of deal he is referring to.[91] It is also unclear from the record how "house deals," as defined by Genova, are distributed to Client Advisors in the event that the manager decides not to handle the entire deal himself, nor does either party establish the monthly number

---

[89] *Id*. at 60:1–24.

[90] Deposition of Steve Zeigler, Doc. 78-2 at 85:22–86:9 ("Zeigler Deposition").

[91] *Id*. at 87:15. Zeigler goes on to state: "Typically speaking, our policy, employee purchases—an employee purchase is going to be done by a manager or that employee gets to pick who he wants the salesperson to be. I mean, it's not a house deal, but I don't recall there ever being three or four a month." *Id*. at 87:17–22. It is unclear what Zeigler means by "employee purchase."

of "referrals from service."

Internet sales leads are distributed in round-robin format by sales managers to the Client Advisors who are present and available in the dealership at the time the sales manager receives the lead. Both Genova and Zeigler were responsible for distributing internet leads to the Pre-Owned Car Sales Client Advisors. Genova testified that while "BMW's parameters were an hour," Baron's goal was to have a Client Advisor respond to an internet lead within thirty minutes of the dealership receiving it.[92]

Zeigler testified that "[a]s a general, broad statement,"[93] more internet leads tend to come in on Sundays, when Baron is closed, than on any other day of the week. More specifically, Zeigler testified:

> Q: . . . Do we agree that more of the internet leads came in on Sunday than any other day of the week?
>
> A: Probably. I mean, Sundays, as I recall, were going to be, you know, 10, 20, whenever [sic] it was on a Sunday versus the typical overnight during the week which is a shorter time period obviously you might have got eight, 10, 12, whatever it was.
>
> Q: And, so, if you were either scheduled to come in at 8:30 Monday morning or took it upon yourself to have the initiative or just chose to come in at 8:30 Monday morning you would get a [sic] disproportionate leads that came in through the internet?
>
> A: Depending on who's there, how many leads you have, who's there, and when's the next person coming in, yeah.[94]

As to whether Baron receives more internet leads on Sundays than on other days, Griddine testified as follows:

---

[92] Genova Deposition, Doc. 78-4 at 57:2–7.

[93] Zeigler Deposition, Doc. 78-2 at 81:13–82:3.

[94] *Id*. at 136:2–20.

Q: So but do you know what the—what historically the dealership has seen in terms of the number of leads that are available when they come in Monday morning versus, let's say, the leads that are available that have come in overnight on—on Tuesday night, Wednesday morning, do—do you know what the difference between those is?

A: If I was a manager and I looked at all that, I could tell you that. But—

Q: But you don't know that for sure?

A: But I don't look at those numbers because I'm not a manager.[95]

Zeigler testified that Client Advisors were scheduled to start the work day at staggered times. He also testified that Griddine was "not one of the first people" to arrive at work in the morning, and that "there were a lot of times where he would have to leave during the day to go take care of his mom."[96]

During their depositions, both Zeigler and Genova testified that the rate of conversion from a lead to a sale is higher for showroom and phone leads than it is for internet leads. Specifically, Genova testified that:

You're going to have—your stronger closing percentage is anybody that's walking in front of you. Your closing percentage, national average in the industry on Internet traffic is about ten percent. And that's a good—that's a good client advisor. Some would argue with [sic] seven to eight percent would be the national average closing rate on an Internet lead. So the—the Internet—the people that walk in and set an appointment or call on the phone and set an appointment, you get them at your store, they're in front of you, you're going to close 27 to 30 percent of those. So you have a higher closing rate on somebody who's invested their time to take time out of their day to come sit in front of you and give you that opportunity to try to sell them something.[97]

---

[95] Griddine Deposition, Doc. 78-1 at 87:24–88:11.

[96] Zeigler Deposition, Doc. 86-3 at 76:18–77:6.

[97] Genova Deposition, Doc. 78-4 at 139:16–140:7.

Griddine testified that he does not know what percentage of internet leads turn into sales, stating: "I couldn't tell you the exact number because, again, I'm not—I'm not in upper management, so I don't crunch numbers and look at the stats."[98]

Griddine testified to his belief that Baron distributed internet leads according to the zip code of the prospective customer:

> Q: What's the basis for—well, first let me ask you this: Do you believe that leads were in any way being assigned based on ZIP codes?
>
> A: . . . A lead comes in, manager reads the lead. He can—those guys, again, like I said, I had a lot of respect for Genova and Zeigler because they're very good at what they do in terms of—in terms of the automobile business and their managerial skills, and they've got a good grasp of what's going on and that kind of thing. And that's why they read the leads. They read them, a guy can read a lead and tell whether or not in a sense, hey, this person's really a buyer. You know, I think this is a hot lead. Okay, this ZIP code attached to that is from an area where the household income could be 80,000, where this ZIP code over here, this lead comes in and they're not asking the right questions, and it could be from a ZIP code of 64105 where the household income may be 15,000. They're smart enough to know that. And so the answer to your question are they assigning leads based on what they read in ZIP codes? Absolutely.
>
> Q: That's your belief?
>
> A: That's my belief.[99]

Griddine contends that potential customers who became buyers were more likely to reside in certain zip codes, and during his deposition referred to "charts" he prepared purporting to show some "correlation" between customer zip codes and lead assignment among Client Advisors.[100]

---

[98] Griddine Deposition, Doc. 78-1 at 304:22–25.

[99] *Id*. at 326:10–327:13.

[100] *Id*. at 327:19–22.

However, these charts are not part of the record before the Court,[101] and Griddine does not point to any evidence that leads were distributed based on zip codes beyond his own speculative testimony. Regarding the buying power of customers generally—including customers from different zip codes—Griddine testified that "[y]ou can't judge a book by its cover. I learned that a long time ago just because—you just can't—you can't do that."[102]

Information related to leads, customers, and sales are tracked and maintained in Baron's Customer Relations Management (CRM) system. Every Client Advisor has access to the CRM system and can access and record activity related to customers and leads that have been assigned to that particular Client Advisor. The CRM system generates a report called an "Activity Report," which reflects the number of showroom, telephone, and internet leads assigned to each Client Advisor. House deals are not tracked separately in the CRM system as an independent category of leads, but are instead captured in the showroom lead category.

From May 1, 2015 through April 30, 2016, the CRM Activity Report reflects that Griddine received 848 leads—the highest number of total leads among all Client Advisors in the Pre-Owned Car Sales Department—comprised of 276 showroom leads, 281 phone leads, and 291 internet leads. Rayan Awad (Egyptian male, age 34 as of April 2016), Ryan Ediger (Caucasian male, age 34 as of April 2016), and Brandon Shannon (Caucasian male, age 29 as of April 2016), also worked as Client Advisors in Baron's Pre-Owned Sales Department during

---

[101] These are not the same charts that the Court found inadmissible in Section II.B.2, *supra*.

[102] Griddine Deposition, Doc. 78-1 at 250:20–23. Defendants contend that Griddine's testimony supports their assertion that he has conceded that "there was no way to determine whether a particular internet lead would result in the purchase of a vehicle based on the information contained within the internet lead." Doc. 88 at 6–7. Griddine's testimony does not go quite that far. While he agreed that "you can't judge a book by its cover" based on the individual customer's zip code, the additional testimony Defendants cite relates to Griddine's lack of knowledge of the overall percentage of internet leads that turn into sales, rather than whether customers residing within certain zip codes may be more likely to purchase.

Griddine's time there. From May 1, 2015 through April 30, 2016, Awad had 669 total leads (179 less than Griddine), comprised of 124 showroom leads, (152 less than Griddine), 106 telephone leads (175 less than Griddine), and 439 internet leads (148 more than Griddine). During the same period, Ediger had 788 total leads (60 less than Griddine), consisting of 216 showroom leads (60 less than Griddine), 106 phone leads (175 less than Griddine), and 466 internet leads (175 more than Griddine). Finally, Shannon had 833 total leads (15 less than Griddine), including 170 showroom leads (106 less than Griddine), 193 phone leads (88 less than Griddine), and 470 internet leads (179 more than Griddine). Neither party points to evidence of how many of the foregoing individuals' showroom leads were "house deals."

Griddine does not dispute the accuracy of the leads attributed to himself, Awad, Ediger, and Shannon, but does dispute that these individuals are "comparators."[103] Although Defendants claim that Griddine identified these individuals as his comparators during his deposition, they do not point the Court to any such testimony. However, when explaining why Awad, Ediger, and Shannon had substantially more internet leads than other Client Advisors, Zeigler testified that these three individuals were his "go-to guys" because they were "the most aggressive" and were all "workaholic guys."[104] Zeigler stated that in comparison to Griddine, Awad, Ediger, and Shannon "put in more hours,"[105] and that "if you want to make more money you need to put in more hours, plain and simple."[106]

---

[103] Doc. 86 at 4.

[104] Zeigler Deposition, Doc. 86-3 at 158:3–8.

[105] *Id.* at 158:15.

[106] *Id.* at 159:15–17.

Posted in the Pre-Owned Sales Manager's office at Baron was a board on which the Client Advisors' names were listed in order from most sales to fewest. Griddine testified that when he saw his name at the bottom of the list shortly after he started at Baron, he told Genova that it would not be long before he was at the top of the list. Griddine testified that in response, Genova said, "I don't think you'll ever get there."[107]

### D. Turnover Assistance

Griddine contends that he received "unfavorable assistance from Zeigler and Genova through a 'T-O' to attempt to close a sale."[108] A "T-O," which is short for "turnover," refers to a Client Advisor receiving assistance from another Client Advisor or a manager in attempting to close a sale. Griddine did receive T-O assistance while at Baron, and testified that "when I've gone and asked for T-Os, I wasn't always told no or I'm too busy or something like that. I've had help with T-Os before. Just depends on how busy maybe a manager might have been at that time."[109] When asked whether he could identify any instance in which he needed manager assistance with a sale and did not get it, Griddine did not specifically identify any such instance. When asked whether there was anything to which he could refer to "identify specifically what customer[s] that would be involved in this situation that you're talking about with manager assistance," Griddine testified, "That's something that I would have to think about," but again, did not identify any particular instance of being denied assistance with a customer.[110]

---

[107] Griddine Deposition, Doc. 78-1 at 219:4–220:1.

[108] Pretrial Order, Doc. 72 at 7.

[109] Griddine Deposition, Doc. 78-1 at 264:5–9.

[110] *Id*. at 263:8–13.

### E. Customer Protective Policy

Griddine contends that he was subjected to "[n]on-enforcement of the Customer Protective Policy under which a Client Advisor's customer prospect would not be shared or re-distributed for a set period of time after the Client Advisor's first contact with the customer prospect."[111] Regarding this purported policy, Genova testified as follows:

> Q: All right. As we describe it in [sic] the bottom of Page 4 there in the paragraph: Once a client advisor made contact with a prospective customer, the client advisor had a period of 30 days of exclusive contact with that customer. Are you familiar with that, let's say, procedure, if we're not calling it a "policy," at Baron?
>
> A: Yes.
>
> Q: And so that—is that an accurate statement of that customer procedure?
>
> A: That's an accurate statement, with the exception I would say "exclusive," I wouldn't say "exclusive." That's really a gray area, in my opinion. But that's my opinion.
>
> Q: Was this rule or policy ever put down in writing at Baron?
>
> A: Not to my knowledge.
> . . .
>
> Q: I take it the policy or the procedure having to do with 30 days is intended to allow the advisor to try to develop a relationship with the prospective customer; is that fair to say?
>
> A: 30-day window?
>
> Q: Yes.
>
> A: The whole idea of the 30 days would be, yeah, one, to build the relationship, two, and to make sure that you're having continuous contact. If you haven't had contact with a customer in six weeks and they come back, shame on the client advisor for not having good contact and follow-up.

---

[111] Pretrial Order, Doc. 72 at 7.

Q: Right.

A: You haven't built enough rapport, you haven't done enough right things, you haven't communicated properly with your customer for them to come back and specifically ask for you—

Q: Right.

A: —to help them purchase a vehicle.

Q: Let me clarify this: Is the 30 days just running from the first date of contact or does it run from the date of last contact?

A: From initial contact.[112]

Zeigler also testified about the policy or procedure:

Q: All right. Near the bottom of page 4 we say, Baron had a policy called the customer protective policy. Do you see that?

A: Yes.

Q: We say, under that policy when a client adviser made contact with a prospective customer by way of telephone, text, Email or in person, that prospective customer became the exclusive prospective customer of the client adviser for a period of 30 days from the date of the first contact. Do you see that?

A: Yes.

Q: Do you agree with that?

A: No.

Q: Okay, what part or parts do you disagree with?

A: There's nothing called a, quote, customer protective policy, however you worded it, I've never heard that before. If they did their—if the salesperson did their job, this isn't—this is Baron's client. This isn't any salesperson's client. If the salesperson makes a phone call and does nothing for a week, 10 days, two weeks, three weeks, four weeks, they have to have followed up with their client and followed the appropriate sales steps.

---

[112] Genova Deposition, Doc. 78-4 at 65:16–66:8, 68:14–69:11.

Q: Okay, and again we say here 30 days from first contact.

A: With the assumption they did their job and they followed up with the client, which would be multiple phone calls, Emails, whatever, whatever the scenario was.

Q: Okay, so, there was a policy provided that occurred?

A: Yes, if they did their job. I don't recall the 30 days. I don't think it was ever—I don't remember that part.

Q: Do you recall a specific time period?

A: It was more like—it depends. If it was a walk-in, is it an internet lead, was it a phone call. Two weeks, three weeks, but again this all goes back to did they perform the sales function to follow up with the client and do their job. If they didn't then there's no, quote, protective—what did you call it, customer protected policy.[113]

Griddine testified during his deposition that he recalls:

two or three time where my customer come back in, no one told me my customer's here, they let another client advisor sell the customer a car, never told me. The only way I found out was reading notes in the CRM system. Then when I asked management about it, they blew it off like, um, I don't know.[114]

However, the only specific instance of a violation of the Customer Protective Policy that Griddine testified to involved Client Advisor, James Sealey, and customer, Murray Blackwelder.

At the time Griddine was employed by Baron, fifty-year-old Sealey, a Caucasian male, was a Client Advisor in the New Car Sales Department and reported to the New Car Sales Manager. Griddine testified that although he worked with Blackwelder on his first visit to Baron, Sealey worked with him when he eventually returned and purchased a car. Regarding

---

[113] Zeigler Deposition, Doc.78-2 at 93:14–95:9. Defendants also point to Stockwood's Declaration to establish the "many exceptions" to the Customer Protective Policy. However, having found the cited paragraph of the Declaration inadmissible, the Court does not consider it.

[114] Griddine Deposition, Doc. 78-1 at 60:16–22.

how much time had passed between his initial contact with Blackwelder and Sealey's sale of a

car, Griddine testified:

> Q: And do you know exactly how long that was after you had the
> conversation with Mr. Blackwelder on the lot?
>
> A: When he initially came in, he told me that he worked at UMKC,
> I don't know if he was a professor or what he actually did at UMKC,
> but he says, "I'm looking for a retirement car and I'm going to buy
> this car in two or three months. And I just wanted to stop by today
> to look at the product, drive cars, make sure that's what I really want
> and I'm going to do something in two or three months." So I did
> my job, showed him the car, we hit it off well, and I stayed in touch
> with him like I was supposed to.
> . . . .
>
> Q: So do you know how long it was between when he initially came
> in and when he did buy the car?
>
> A: Based on what he told me, it could have been two or three or four
> months when he retired.[115]

Griddine testified that when he asked Sealey about his sale to Blackwelder, Sealey stated that he

was not aware that Griddine previously had contact with the customer. Griddine testified that he

believes the reason Zeigler and Genova did not respond when he complained about Sealey's sale

to Blackwelder was that "James Sealey was a golden child in new cars, nothing he could do was

wrong. He sold a lot of cars and if you sell a lot of cars, everybody loves you."[116]

While he worked at Baron, Griddine was consulting with Pennie Murray, Ph.D., a "peer

coach" or "co-coach."[117] Dr. Murray testified that in March 2016, Griddine reported suffering

from sleeplessness, anxiety, and distress. She recalled a conversation with Griddine that was

---

[115] *Id.* at 63:9–64:7.

[116] *Id.* at 65:7–10.

[117] Murray Deposition, Doc. 86-1 at 16:21–23.

"very sad," and that "[i]t was almost like [Griddine's] heart was broken."[118]  Dr. Murray also

recalled suggesting to Griddine that he see a medical doctor, but could not remember whether he

did so.

    **F.**    **Griddine's Complaints to Baron**

        On April 22, 2016, Griddine met with Baron's Human Resources Manager, Julie

Stockwood, to discuss his concerns about his job, including: (1) lead distribution; (2) post-sale

customer surveys; (3) his compensation; and (4) his accrual of vacation pay.  However, Griddine

did not have any specific examples to support his concerns.  Griddine and Stockwood agreed to

suspend the meeting to allow Griddine to gather information.  At no time during this meeting did

Griddine complain about or allege any discrimination.  Further, Griddine had already made the

decision to resign *before* he met with Stockwood on April 22, 2016.[119]

        On April 26, 2016, Griddine sent an email to Stockwood in which he stated for the first

time, "I have been discriminated against whether it be age, race or so forth."[120]  While Griddine

complained about being subjected to "unfair policies" and "unfair labor practices," being

"deprived earnings," the "system work[ing] against [him]," a "lack of sales opportunities," and

not being "given equal opportunities," his email provided no specifics about the alleged

discrimination, such as client names or information about the assignment of leads.[121]  At no time

prior to April 26, 2016 did Griddine complain to any member of Baron management or Human

Resources the he believed he had been discriminated against.

---

[118] *Id.* at 84:25–85:2.

[119] Pretrial Order, Doc. 72 at 4.

[120] Doc. 78-1 at 126.

[121] *Id.*

On the morning of April 27, 2016, Stockwood responded to Griddine's email from the previous day stating, in relevant part:

> I want to address your concerns with you and want to make this a priority. I respectfully request that you allow me a few moments to get caught up with other pressing matters so that I can devote attention to yours.
>
> Do you have time today late afternoon? Is that too late for you? My memory is that we agreed to stay our discussion until you could gather your evidence. Do you plan to bring it with you? It will better me help [sic] to understand your position on your issues.[122]

In an email response, Griddine suggested meeting at 3:00 pm and stated that he was "still fact finding on some of [his] issues," and that he would "have it all together before [he] resign[ed] in the next two weeks."[123]

Griddine and Stockwood met as agreed on the afternoon of April 27, 2016 to discuss Griddine's concerns about his employment at Baron. At that meeting, Griddine told Stockwood that he believed his previous two managers—Genova and Zeigler, both of whom had left Baron in March 2016—had discriminated against him. He testified that at the meeting, Stockwood stated that she did not "want to talk about the past," but about "what can we do moving forward," to which Griddine replied, "The reason why I'm here is because of things that happened in the past and if you don't know about them, you can't correct them."[124] Griddine did not provide Stockwood with examples of any alleged discriminatory conduct that he claimed was still occurring.

---

[122] Doc. 78-1 at 132.

[123] *Id.*

[124] Griddine Deposition, Doc. 78-1 at 99:6–15.

At some point in April 2016, after Griddine had raised his complaints with Stockwood, Stockwood walked past a group of three to four Client Advisors, including Griddine, and stated, "This looks like trouble."[125]  In response, Griddine told Stockwood that his name was "Thomas," not "Trouble."[126]  Stockwood apologized to Griddine and explained that she was not calling him "Trouble" and did not intend to offend him.  Rather, Stockwood's comment to the group of Client Advisors was intended to be light-hearted, was not directed toward anyone in particular, and was not intended to be derogatory in any way.  Griddine accepted her apology and never raised any issue with this statement to Stockwood again.  Griddine testified that neither Genova nor Zeigler ever made any age- or race-based statements to him.

### G.    Griddine's Separation from Baron

On April 29, 2016, Griddine gave Baron two weeks' notice that he was resigning his employment.  Griddine's supervisor at the time, Brad Pointer, tried to convince him to stay at Baron, but Griddine declined to reconsider.  Griddine testified that he would not consider staying because he had "lost confidence in management totally."[127]

Griddine testified that in May 2016, he realized that another Client Advisor had taken one of his clients, and that this made him "very frustrated" and triggered him to leave Baron before the end of his two weeks' notice.[128]  However, Griddine could recall neither the name of the Client Advisor nor the prospective client.  Griddine did not return to his employment with Baron on or after May 9, 2016.  He was fifty-seven years old at the time he resigned.

---

[125] Stockwood Declaration, Doc. 78-3, ¶ 20.

[126] *Id.*

[127] Griddine Deposition, Doc. 78-1 at 154:18–19.

[128] *Id.* at 54:4–55:7.

## IV. Analysis

### A. The ADEA and the *McDonnell Douglas* Burden-Shifting Framework

The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."[129] The Supreme Court has held that the ADEA does not authorize mixed-motives age discrimination claims—"the ordinary meaning of the ADEA's requirement that an employer took an adverse action 'because of' age is that age was the 'reason' that the employer decided to act."[130] Thus, "[t]o establish a disparate treatment claim under the plain language of the ADEA . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."[131] However, the requirement that age must have been the but-for reason for the adverse employment action "does not disturb longstanding Tenth Circuit precedent by placing a heightened evidentiary requirement on ADEA plaintiffs to prove that age was the sole cause of the adverse employment action," nor does it "preclude [the] continued application of *McDonnell Douglas* to ADEA claims."[132]

Under the ADEA, the plaintiff bears the ultimate burden of proving his employer intentionally discriminated against him,[133] but may do so "through either direct evidence or

---

[129] 29 U.S.C. § 623(a)(1).

[130] *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

[131] *Id.* at 177 (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 652–55 (2008); *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63–64 (2007)).

[132] *Locke v. Grady Cty.*, 437 F. App'x 626, 629 (10th Cir. 2011) (quoting *Jones v. Okla. City Pub. Schs.*, 617 F.3d 1273, 1278 (10th Cir. 2010)).

[133] *Bennett v. Windstream Comm'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015) (citing *Riser v. QEP Energy*, 776 F.3d 1191, 1199 (10th Cir. 2015); *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008)).

circumstantial evidence that creates an inference of intentional discrimination."[134]  Where the plaintiff "seeks to use circumstantial evidence to show [his] employer's discriminatory intent, [the court] employ[s] the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)."[135]  Griddine concedes that he lacks direct evidence of discrimination and states that "his evidence under Count I, the ADEA, amounts to a case of indirect, or circumstantial evidence,"[136] requiring the application of the *McDonnell Douglas* burden-shifting scheme.

Under the *McDonnell Douglas* framework, the plaintiff bears the initial burden of establishing a prima facie case of age discrimination.[137]  This burden is "not onerous."[138]  If the plaintiff meets his burden of establishing a prima facie case, the burden then shifts to the defendant employer to set forth a legitimate, non-discriminatory reason for its actions.[139] Finally, if the defendant employer does offer a legitimate, non-discriminatory reason for its actions, the plaintiff must then show that the reason stated by the employer is mere pretext for discrimination.[140]  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the

---

[134] *Id.* (citing *Riser*, 776 F.3d at 1199).

[135] *Id.* (citing *Adamson*, 514 F.3d at 1145).

[136] Doc. 86 at 11.

[137] *Bennett*, 792 F.3d at 1266.

[138] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

[139] *Bennett*, 792 F.3d at 1266 (citing *Adamson*, 514 F.3d at 1145).

[140] *Id.*

employer unlawfully discriminated."[141]  Again, "[d]espite the shifting framework, the ultimate burden of persuasion remains with the plaintiff."[142]

B.      **Elements of a Prima Facie Case of Age Discrimination**

As this Court has previously noted, Tenth Circuit jurisprudence on the elements of a prima facie case of discrimination has not been "entirely consistent,"[143] and the elements may vary depending on the type of discrimination and adverse employment action alleged.[144]  The Tenth Circuit has acknowledged that it "has utilized a number of similar versions of the test, expressing a preference for more concise formations."[145]  "Regardless of the particular elements, the Court is mindful that they are 'neither rigid nor mechanistic.'  And, the purpose of a prima facie case is 'establishment of an initial inference of unlawful discrimination warranting a presumption of liability in plaintiff's favor.'"[146]  Here, the Court applies the broadest formulation of a prima facie case of age discrimination, meaning that Griddine must show that: (1) he was within the protected class; (2) he was doing satisfactory work; (3) he suffered an adverse

---

[141] *Id*. at 1266–67 (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 148 (2000)).

[142] *Lewis v. Twenty-First Century Bean Processing*, No. 2:15-CV-02322-JAR-TJJ, 2015 WL 4774052, at *2 (D. Kan. Aug. 13, 2015), *aff'd*, 638 F. App'x 701 (10th Cir. 2016) (citing *Richardson v. Blue Cross/Blue Shield of Kan., Inc*., 196 F. Supp. 2d 1174, 1181 (D. Kan. 2002)).

[143] *Id.* at *3 (quoting *Sorbo v. United Parcel Serv., Inc*., 432 F.3d 1169, 1173 & n.4 (10th Cir. 2005) and citing *Jaramillo v. Colo. Judicial Dep't*., 427 F.3d 1303, 1307 n.1 (10th Cir. 2005); *Kosak v. Catholic Health Initiatives of Colo*., 400 F. App'x 363, 366 (10th Cir. 2010); *Jones v. Okla. City Pub. Schs*., 617 F.3d 1273, 1279 (10th Cir. 2010); *Medlock v. United Parcel Serv., Inc*., 608 F.3d 1185, 1191 n.5 (10th Cir. 2010)).

[144] *Id.* (citing *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005)).

[145] *Bennett,* 792 F.3d at 1266 n.1 (citing *Tabor v. Hilti, Inc*., 703 F.3d 1206, 1216 n.4 (10th Cir. 2013); *Sorbo*, 432 F.3d at 1173).

[146] *Lewis*, 2015 WL 4774052, at *3 (quoting *Velasquez v. Philips Elecs. N. Am. Corp*., No. 13-1463-DDC-KMH, 2015 WL 505628, at *7 (D. Kan. Feb. 6, 2015)) (internal citation omitted).

employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination.[147]

Defendants assert, without support, that the *McDonnell Douglas* burden-shifting analysis does not apply because "Griddine did not assert a claim for disparate treatment in his Complaint or the Final Pretrial Order,"[148] and because in cases involving alleged constructive discharge, "even if the plaintiff were to establish a prima facie case, the defendant would not be in a position to state a legitimate non-discriminatory reason, nor would the pretext analysis make any sense."[149] Contrary to Defendants' assertion that this case does not involve disparate-treatment claims, Griddine expressly alleges in Count I of his Amended Complaint that "the terms and conditions of [his] employment became so intolerable . . . that a reasonable person would have been compelled to resign from employment with the Defendant" due to Baron imposing "*disparate treatment upon the Plaintiff compared to similarly situated employees of the Defendants who were outside of the protected class.*"[150] Specifically, as set forth above, Griddine contends in the Pretrial Order that he was subjected to the following disparate treatment on the basis of age, which resulted in his constructive discharge in violation of the ADEA: (1) the unfavorable placement of his desk assignment; (2) the unfavorable distribution of customer leads that came to the dealership through the internet and through "house deals" under the round-robin format used by management; (3) the unfavorable distribution of internet customer leads

---

[147] *Id.* at *4.

[148] Doc. 88 at 16.

[149] *Id.*

[150] Doc. 6, ¶¶ 26, 28 (emphasis added).

that were more likely to result in sales; (4) unfavorable assistance from Zeigler and Genova in regard to a T-O; and (5) non-enforcement of the Customer Protective Policy.[151]

The Tenth Circuit has applied *McDonnell Douglas* in cases involving constructive discharge and held that "[e]ven where, as here, the plaintiff resigned rather than being fired, he may demonstrate a prima facie case of discrimination if he can show that he was constructively discharged in that the defendant exposed him to intolerable working conditions."[152] Thus, the fact that this case involves alleged constructive discharge does not preclude the application of *McDonnell Douglas*.[153] Defendants go on to say that even if this case is analyzed according to the *McDonnell Douglas* burden-shifting framework, they are entitled to summary judgment

---

[151] Pretrial Order, Doc. 72 at 6–7. It is true that "constructive discharge cannot constitute an independent cause of action" and that there must be some underlying discrimination claim to support a constructive discharge claim for damages. *See, e.g., Kear v. Kohl's Dept. Stores, Inc.*, No. 12-CV-1235-JAR-KGG, 2013 WL 424881, at *4 (D. Kan. Feb. 4, 2013) (citing *Schmidt v. Medicalodges, Inc.*, 492 F. Supp. 2d 1302, 1305 (D. Kan. 2007)); *Smith v. Turner Unified Sch. Dist. No. 202*, No. Civ.A. 03–2516–KHV, 2004 WL 2607553, at *5 (D. Kan. Nov. 16, 2004) (citing cases); *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 517 (7th Cir. 1996) (internal and final citations omitted) (explaining that "[i]n order to recover under a constructive discharge theory of discrimination, the plaintiff must demonstrate first that he was, in fact, constructively discharged—i.e., that the defendant made the working conditions so intolerable as to force a reasonable employee to leave. Once a plaintiff has shown that a constructive discharge occurred, he must prove, as with any other discharge claim under Title VII, that he was constructively discharged because of his membership in a protected class."). Here, Griddine asserts that he was constructively discharged because of his age in violation of the ADEA.

[152] *Hooper v. Montgomery Kone, Inc.*, 60 F. App'x 732, 734 (10th Cir. 2003) (citing *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1222 (10th Cir. 2000)).

[153] *See, e.g., Lara v. Unified Sch. Dist. No. 501*, 350 F. App'x 280, 283 (10th Cir. 2009) (citing *Fischer v. Forestwood*, 525 F.3d 972, 980 (10th Cir. 2008)) (applying *McDonnell Douglas* and stating that "[w]hen a plaintiff resigns, he may establish the adverse action element by showing that he was constructively discharged"); *DeWalt v. Meredith Corp.*, 288 F. App'x 484, 494 (10th Cir. 2008) (citing *Fischer*, 525 F.3d at 979) ("A plaintiff can meet the [adverse employment action] requirement of the prima facie case by showing that he was forced to resign and therefore was effectively terminated"); *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135–36 (10th Cir. 2004) (applying *McDonnell Douglas* burden-shifting analysis to constructive-discharge claim and finding that plaintiff failed to establish adverse employment action element of prima facie case); *Saville v. Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1534 (10th Cir. 1995) (citation omitted) (stating, as to § 1981 claim for constructive discharge on the basis of race, that the "plaintiff must establish as the third element of her prima facie case that Defendants subjected her to working conditions that a reasonable person would view as intolerable, while not so treating members of a different race"); *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1153–54 (10th Cir. 1990) (citations omitted) (setting forth burden-shifting framework and elements of prima facie case of age discrimination and stating that "[a] finding of constructive discharge is supported by evidence that an employee has resigned, rather than waiting to be fired, because of unreasonably harsh conditions that have been applied to him in a discriminatory fashion").

because Griddine cannot establish the third element of a prima facie case, *i.e.*, that he suffered an adverse employment action.[154]  With regard to this argument, the Court agrees.

### C.     Griddine Has Failed to Show that He Suffered an Adverse Employment Action

Griddine concedes that none of Baron's alleged discriminatory practices—other than his alleged constructive discharge—are alone sufficient to meet the third element of a prima facie case.  Specifically, he states in his response that: "[t]he Plaintiff does not contend that any of the discriminatory practices by themselves constituted an adverse action, but that they collectively and cumulatively made Griddine's work environment such that it was intolerable to a reasonable person, and thus support the constructive discharge claim."[155]

To establish constructive discharge, an employee must prove that his "employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign."[156]  "A true constructive discharge equates to a formal discharge in the context of discrimination claims, and termination of employment constitutes adverse employment action."[157]  However, a finding of constructive discharge depends upon whether a reasonable person would view the working conditions as

---

[154] Defendants do not dispute that Griddine was over forty at the time of his resignation and, therefore a member of the protected class.  Because it finds that Griddine has not established the adverse employment action element of a prima facie case (or, therefore, that such action occurred under circumstances giving rise to an inference of discrimination), the Court does not address whether Griddine has shown that he was doing satisfactory work at the time of his resignation.

[155] Doc. 86 at 17.

[156] *Derr v. Gulf Oil Corp.,* 796 F.2d 340, 344 (10th Cir.1986); *see also United States ex rel. Coffman v. City of Leavenworth, Kan.,* 303 F. Supp. 3d 1101, 1128 (D. Kan. 2018) (citing *Derr,* 796 F.2d at 344; *Irving v. Dubuque Packing Co.,* 689 F.2d 170, 172 (10th Cir. 1982)) ("A constructive discharge occurs when an employer, by discriminatory or retaliatory actions, makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit.").

[157] *Duckett v. Water Dist. One of Johnson Cty.,* Case No. 07-2376, 2009 WL 10708342, at *15 (D. Kan. Feb. 26, 2009) (citing *Penn. State Police v. Suders,* 542 U.S. 129, 141 (2004); *Pacheco v. Whiting Farms, Inc.,* 365 F.3d 1199, 1206 (10th Cir. 2004)).

intolerable, not upon the view of the plaintiff employee.[158]  In other words, the conditions of employment must be objectively intolerable; the plaintiff's subjective views of the situation are irrelevant, as is the employer's subjective intent.[159]

"If an employee resigns of [his] own free will, even as a result of the employer's actions, that employee will not be held to have been constructively discharged."[160]

> The question is not whether the employee's resignation resulted from the employer's actions, but whether the employee had any other reasonable choice but to resign in light of those actions. Further, conduct which meets the definition of a "tangible employment action" or an "adverse employment action" is not necessarily sufficient to establish a constructive discharge because a constructive discharge requires a showing that the working conditions imposed by the employer are not only tangible or adverse, but intolerable.[161]

---

[158] *Coffman*, 303 F. Supp. 3d at 1128 (citing *Derr,* 796 F.2d at 344).

[159] *Id.* (citing *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 534 (10th Cir. 1998); *Yearous v. Niobrara Cty. Mem'l Hosp.*, 128 F.3d 1351, 1356 (10th Cir. 1997), *cert. denied,* 523 U.S. 1074 (1998)); *see also Derr,* 796 F.2d at 344 (expressly adopting objective standard under which neither the subjective view of the plaintiff nor the subjective intent of the employer is relevant); *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 805 (10th Cir. 2007) (quoting *Tran v. Tr. of State Colls. in Colo.*, 355 F.3d 1263, 1270 (10th Cir. 2004)) ("[W]e apply an objective test under which neither the employee's subjective views of the situation, nor her employer's subjective intent . . . are relevant."); *Richardson v. Gen. Motors LLC*, Case No. 14-2351-JAR-TJJ, 2016 WL 844821, at *4 (D. Kan. Mar. 1, 2016) (citing *Keller v. Crown Cork & Seal USA, Inc.*, 491 F. App'x 908, 915 (10th Cir. 2012), *cert. denied*, 568 U.S. 1230 (2013)); *Fugett v. Security Transport Servs., Inc.*, 147 F. Supp. 3d 1216, 1235 (D. Kan. 2015) (citing *Keller*, 491 F. App'x at 915).

[160] *Coffman*, 303 F. Supp. 3d at 1128 (quoting *Jeffries v. State of Kan.*, 147 F.3d 1220, 1233 (10th Cir. 1998), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)).

[161] *Tadlock v. U.S. Dep't of Transp.*, No. 12-2148-JAR-JPO, 2013 WL 823309, at *9 (D. Kan. Mar. 6, 2013), *aff'd*, 550 F. App'x 541 (10th Cir. 2013) (quoting *Tran*, 355 F.3d at 1270–71); *PVNF, L.L.C.*, 487 F.3d at 806 (citation omitted) (stating that "[a] constructive discharge requires a showing that the employer's actions are not merely adverse, but intolerable"); *Duckett*, 2009 WL 1070832, at *15 (citing *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 980 (10th Cir. 2008)) (stating that "even some evidence of discriminatory animus in the workplace will not necessarily establish a constructive discharge claim; there must also be aggravating factors that make staying on the job intolerable").

"The bar is quite high in such cases: a plaintiff must show [he] had no other choice but to quit."[162] "[A]n employee cannot survive summary judgment merely by producing evidence that work conditions were difficult or unpleasant."[163] "Whether a plaintiff was constructively discharged is a question of fact, and 'judgment as a matter of law is only appropriate if the evidence is susceptible to but one interpretation.'"[164]

Griddine alleges that because he was treated disparately from other Client Advisors on the basis of his age, his working conditions became so intolerable that he was forced to resign his employment with Baron. However, the Court finds that on this record, a reasonable person could not find, under an objective standard, that Defendants allowed Griddine's working conditions to become so intolerable that he had no other choice but to quit.

In addition to conceding that none of the alleged discriminatory practices he relies upon to support his constructive discharge claim would individually qualify as an adverse employment action, Griddine points to no specific evidence that he was given a less favorable desk assignment than younger employees, that he was given fewer "house deals" than younger employees, that the internet leads he received were less likely to result in sales than those given to younger employees, that he received less favorable assistance with T-Os than younger

---

[162] *Coffman*, 303 F. Supp. 3d at 1128 (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002)); *see also Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004) (citing *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1222 (10th Cir. 2000); *Yearous*, 128 F.3d at 1357) ("Working conditions must be so severe that the plaintiff simply had no choice but to quit."); *Duckett*, 2009 WL 1070832, at *15 (citing *Thomas v. Atmos Energy Corp.*, 223 F. App'x 369, 375 n.2 (5th Cir. 2007)) (stating that although constructive discharge qualifies as an adverse employment action, "plaintiff is still required to satisfy the stringent test for constructive discharge").

[163] *Coffman*, 303 F. Supp. 3d at 1128 (citing *Fischer*, 525 F.3d at 981); *Steele v. City of Topeka*, 189 F. Supp. 3d 1152, 1161 (D. Kan. 2016) (citing *Potts v. Davis Cty.*, 551 F.3d 1188, 1194 (10th Cir. 2009) ("The law expects employees to tolerate merely 'difficult or unpleasant' working conditions; but undesirable working conditions become legally intolerable once those conditions leave an employee that seeks relief with no other reasonable choice but to quit."); *DeWalt v. Meredith Corp.*, 288 F. App'x 484 (10th Cir. 2008) (quoting *Exum*, 389 F.3d at 1135) ("'The question is not whether working conditions . . . were difficult or unpleasant,' but rather whether the plaintiff's decision to resign can properly be characterized as involuntary.").

[164] *Fugett*, 147 F. Supp. 3d at 1235 (quoting *Keller*, 491 F. App'x at 915).

employees, or that the purported "Customer Protective Policy" was applied differently in his case on the basis of age.[165]

While it is true that three younger employees received more internet leads than Griddine during the period of May 1, 2015 through April 30, 2016, Griddine contests that these younger individuals are "comparators" and, again, points to no evidence that this difference was due to his age. Griddine contends that Genova's stated belief that Griddine would never reach the top of the sales board is especially "telling," and that a reasonable juror could infer discriminatory intent from that remark.[166] He further argues in his response brief that when Zeigler referred to Awad, Ediger, and Shannon as "aggressive," that term was code for "young."[167] However, even if Griddine could point to independent evidence, beyond his own opinions and testimony, to support his allegations of discriminatory age-based practices, the law provides that "even some evidence of discriminatory animus in the workplace will not necessarily establish a constructive discharge claim; there must also be aggravating factors that make staying on the job intolerable."[168]

Griddine fails to meet the stringent test for constructive discharge because he lacks proof that Defendants made his working conditions so difficult that a reasonable person in his position would feel compelled to resign. As this Court has noted, the Tenth Circuit has discussed the type

---

[165] Rather, Griddine testified to only one *specific* instance in which he claims Baron violated the Customer Protective Policy. Griddine testified that in that instance, fifty-year-old James Sealey was permitted to work with his customer—potentially as many as four months after Griddine's initial contact that customer—because Sealey was a favorite of management due to his high sales numbers.

[166] Doc. 86 at 17.

[167] *Id.* at 14.

[168] *Duckett v. Water Dist. One of Johnson Cty.*, Case No. 07-2376, 2009 WL 10708342, at *15 (D. Kan. Feb. 26, 2009) (citing *Fischer*, 525 F.3d at 980); *see also Stubbs v. McDonalds Corp.*, Civil Action Nos. 03-2093-CM, 04-2164-CM, 2006 WL 1722267, at *13 (D. Kan. June 20, 2006) (citation omitted).

of evidence a plaintiff must generally produce to meet his burden in a constructive discharge

case:

> For example, where a supervisor asked a plaintiff to quit on numerous occasions, citing her age and image, and repeatedly confronted her with a litany of performance shortcomings, took away longstanding job responsibilities and gave her inadequate information to perform new responsibilities, the court concluded that plaintiff was constructively discharged because the supervisor made it nearly impossible for the plaintiff to continue performing her job.[169]

Griddine's evidence falls short.

At the time of his first meeting with Stockwood on April 22, 2016, Griddine did not have any specific examples to support his concerns about his job and made no claim that he had been discriminated against. Critically, Griddine had already made the decision to resign *before* his first meeting with Stockwood. On April 26, 2016, Griddine sent an email to Stockwood in which he stated for the first time his belief that he had been discriminated against, though he again failed to provide specific information about the nature of the alleged discrimination. When Stockwood responded to Griddine by email on April 27, 2016, she stated that she wanted to address his concerns as a "priority," and asked to meet later the same day.[170] Griddine agreed to meet again and stated that he would have evidence regarding the alleged discrimination gathered "before I resign in the next two weeks," again demonstrating that he had already made the decision to quit.[171] The fact that Griddine had made up his mind to resign before raising his

---

[169] *Duckett*, 2009 WL 10708342, at *15 (citing *Fischer*, 525 F.3d at 980); *see also Steele v. City of Topeka*, 189 F. Supp. 3d at 1162 (collecting cases) ("Other employees have proved constructive discharge with evidence that they faced either pervasive criticism and work-defeating interference or ultimatum-like proposals to quit.").

[170] Doc. 78-1 at 132.

[171] *Id.*

concerns, and therefore did not give Baron a fair opportunity to address any issues, undercuts his argument that he was constructively discharged.[172]

During the second meeting between Griddine and Stockwood on April 27, 2016, Griddine told Stockwood that he believed Genova and Zeigler had discriminated against him, but did not provide Stockwood with examples of any alleged discriminatory conduct that he claimed was still happening. Thus, the only two Baron employees whom Griddine contends treated him in a discriminatory manner are Genova and Zeigler, who had both left Baron by the end of March 2016. The fact that Griddine worked with both Zeigler and Genova for more than a year but waited weeks after both had left to raise any concerns about his employment—combined with the fact that he never claimed discriminatory actions by anyone else at Baron—also undermines his argument that conditions became so intolerable as to force him to resign as of late April 2016.[173] Although Griddine contends that Stockwood was not responsive to his concerns because she did not "want to talk about what happened in the past," but about "what can we do moving forward,"[174] his failure to point to any ongoing discriminatory conduct that

---

[172] *Yearous v. Niobrara Cty. Mem'l Hosp. By and Through Bd. of Trustees*, 128 F.3d 1351, 1357 (10th Cir. 1997), *cert. denied,* 523 U.S. 1074 (1998) (citing *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996)) ("An employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged."); *Haney v. Preston*, No. 08-2658 JAR/GLR, 2010 WL 5392670, at *15 (D. Kan. Dec. 22, 2010) (finding no constructive discharge where "Plaintiff's attempts to explore any option short of retirement were abbreviated and incomplete, and does not appear to have given defendant a reasonable chance to work out her issues and allegations").

[173] *See, e.g., Land v. Midwest Office Tech., Inc.*, 114 F. Supp. 2d 1121, 1146 (D. Kan. 2000) (granting summary judgment in employer's favor on constructive discharge claim where plaintiff's termination occurred three months after incident of harassment and plaintiff "provided no evidence of defendants' conduct after that incident which, whether viewed in isolation, or in conjunction with earlier events, would compel a reasonable employee to resign"); *King v. Rosek*, No. 11-CV-01684-CMA-MJW, 2013 WL 149777, at *2 (D. Colo. Jan. 14, 2013) (finding plaintiff's constructive discharge claim undermined by fact that he remained at defendant employer five months after alleged harasser was terminated).

[174] Griddine Deposition, Doc. 78-1 at 99:8–15.

Stockwood could have corrected belies his claim that his working conditions were, at that time, objectively intolerable.

Griddine offers no evidence that Defendants wanted him to resign, negatively reviewed his performance, took away work responsibilities, or otherwise made it difficult for him to do his job. In fact, when Griddine resigned on April 29, 2016, his then-manager, Brad Pointer, tried to convince him to stay. This evidence supports a finding that Griddine was not constructively discharged,[175] which Griddine's own self-serving testimony that he had lost faith in management does nothing to undercut. Further, although Griddine relies upon the testimony of Dr. Murray that he was suffering from anxiety, depression, and sleeplessness during the time that he worked for Baron and claims that this testimony is "significant to [the] analysis" of whether his resignation was truly voluntary,[176] "[t]he fact that a plaintiff subjectively considers his workplace stressful and may have suffered personal health problems as a result is not an objective criterion used to determine if a reasonable employee would have been compelled to resign."[177]

The Court finds that on this record, viewing the evidence in the light most favorable to Griddine, he has simply failed to show that Defendants "did not allow him to make a free choice regarding his employment relationship."[178] While he may have viewed resignation as his "best

---

[175] *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 982 (10th Cir. 2008) (citing *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1136 (10th Cir. 2004); 1-15 Larson on Employment Discrimination § 15.08) (". . . [Plaintiff] did not produce evidence that his supervisors encouraged him to quit or actively undermined his ability to perform his job. In fact, his supervisor asked him to reconsider his decision to leave the company.").

[176] Doc. 86 at 13.

[177] *Exum*, 389 F.3d at 1136 n.7 (citing *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 534 (10th Cir. 1998)); *see also Potts v. Davis Cty.*, 551 F.3d 1188, 1195 (10th Cir. 2009) (quoting *Exum*, 389 F.3d at 1136 n.7); *Haney*, 2010 WL 5392670, at *15 (citation omitted) ("The fact that a plaintiff subjectively considers his or her workplace stressful and may have suffered personal health problems as a result is not an objective criterion used to determine if a reasonable employee would have been compelled to resign.").

[178] *Exum*, 389 F.3d at 1135 (citing *Yearous v. Niobrara Cty. Mem'l Hosp. By and Through Bd. of Trustees*, 128 F.3d 1351, 1357 (10th Cir. 1997), *cert. denied*, 523 U.S. 1074 (1998)).

option"[179] due to his professed lack of faith in management, he has not presented a genuine issue of material fact as to whether he had no other choice but to quit.  Consequently, Griddine cannot establish the adverse employment action element of a prima facie case of age discrimination, and Defendants are entitled to summary judgment.

      **IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for Summary Judgment (Doc. 77) is **granted** as unopposed with respect to Counts II through VI and **granted** as to Count I, and this case is dismissed in its entirety with prejudice.  Griddine's Motion for Summary Judgment on Affirmative Defense of After-Acquired Evidence (Doc. 79) is **denied as moot**.

      **IT IS SO ORDERED.**

      Dated: February 28, 2019

                                   S/ Julie A. Robinson
                                   JULIE A. ROBINSON
                                   CHIEF UNITED STATES DISTRICT JUDGE

---

[179] *Baca v. Sklar*, 398 F.3d 1210, 1218 (10th Cir. 2005) (stating that although plaintiff's "sour relationship" with the defendant employer may have made resigning his "best option," he had failed to raise a genuine issue of material fact as to whether he had no choice but to quit due to an objectively intolerable working environment.)